2023 IL App (1st) 201109-U

THIRD DIVISION
AUGUST 30, 2023

No. 1-20-1109

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 15 CR 07910 (02) |
| ERICK GILL, | ) ) ) | Honorable William G. Gamboney, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affirming the defendant's conviction and sentence where (1) defendant's arrest pursuant to an investigative alert was constitutional; (2) the prosecutors did not err in questioning witnesses or during closing argument; (3) the trial court did not err in answering a jury question; and (4) the trial court did not err in sentencing defendant.

¶ 2   After a jury trial, defendant Erick Gill was found guilty on three counts of first-degree murder and not guilty on one count of attempted murder based on an altercation which occurred at a Dunkin' Donuts store and resulted in the death of victim Edgar Muneton. At sentencing, the

trial court merged the first-degree murder counts into an intentional-murder count (720 ILCS 5/9-1(a)(1) (West 2014)) and sentenced defendant to 50 years' imprisonment.

¶ 3    Defendant now appeals, arguing that his arrest was unconstitutional and, therefore, the trial court erred when it denied his motion to quash arrest and suppress evidence. Defendant additionally contends that the State erred during its redirect examination of one of its witnesses, that the prosecutors committed misconduct during closing arguments, and that the trial court erred when it answered a question from the jury. Finally, defendant argues that the trial court considered improper aggravating factors when sentencing defendant and that defendant's sentence was excessive. For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5    On March 25, 2015, a group of men entered a Dunkin' Donuts store after recognizing several of the customers through the store's front window. Video footage from the store's surveillance cameras revealed that, upon entering the store, the men chased the customers into the employee area, where several of the men began beating one of the customers while another chased two of them out to the back alley, shot at them, and killed one of them.

¶ 6    Defendant, along with codefendants Alexander Gonzalez and Stephon Gill,[1] were charged with first-degree murder, aggravated battery, aggravated discharge of a firearm, and mob action. The State ultimately proceeded to trial against defendant on three counts of first-degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2014)) and one count of attempted murder (*id.* §§ 8-4(a), 9-1(a)(1)).

¶ 7                              I. Pretrial Proceedings

¶ 8    Prior to trial, defendant filed a motion to quash his arrest and suppress evidence, which

---

[1] The defendant in the instant appeal, Erick Gill, and codefendant Stephon Gill are brothers. We refer to defendant Erick Gill as "defendant," while we refer to codefendant Stephon Gill as "Gill."

contended that his arrest was unconstitutional since the police did not arrest him pursuant to a valid warrant and the police did not have probable cause to believe that he had committed or was about to commit a crime. Accordingly, defendant asked the trial court to exclude any evidence that was the product of the arrest.

¶ 9    In June 2018, the trial court held a hearing on the motion. At the hearing, Detective Juan Carlos Morales of the Chicago Police Department testified that he and a partner investigated a homicide at a Dunkin' Donuts store on West Fullerton Avenue in Chicago. Video surveillance footage of the incident depicted a man being beaten in the store's drive-through area, while another man was shot after being chased into the alley behind the store. Upon viewing the footage, Morales recognized the victim of the beating as Jose Castillo. The day after the incident, Castillo was arrested on unrelated charges, and Morales and his partner spoke to him. Castillo identified one of the men who was beating him as being named "Too Tall." Castillo was then presented with a photo array containing defendant's photo, and he identified defendant as "Too Tall."

¶ 10    The next day, Dustin Betancourt, another of the men present at the scene, was arrested on unrelated charges, and Morales planned to present him with a similar photo array. Prior to presenting the photo array, however, Detective Jose Gomez, the independent administrator of the array, indicated that he recognized defendant from a prior case. Instead of presenting the photo array to Betancourt, Gomez watched the video surveillance footage from the incident, where he recognized defendant and further observed that he was wearing a distinctive jacket which he had previously been wearing when Gomez last encountered him. Believing that he had probable cause to arrest defendant, Morales issued an investigative alert for defendant, in which he noted that defendant was wanted in connection with a homicide.

¶ 11    The investigative alert was assigned to the Great Lakes regional fugitive apprehension team, which included Officer Jeremiah Johnson of the Chicago Police Department and Deputy United States Marshal Jason Norwick, both of whom testified as to the apprehension of defendant. Johnson testified that on April 8, 2015, he and four other officers located defendant and his girlfriend sleeping in her brother's Toyota Camry parked on the street. Defendant was then arrested and placed into custody. Johnson testified that the only information he had about defendant at the time of his arrest was the information contained in the investigative alert; he did not have a warrant for defendant's arrest.

¶ 12    After hearing the parties' arguments, the trial court denied the motion to quash arrest and suppress evidence. The trial court noted that investigative alerts "aren't anything, other than a tool used by the Chicago Police Department, in various investigations," and represented the officer's opinion as to whether the evidence amounted to probable cause for an arrest. The trial court, accordingly, proceeded to consider whether there was probable cause for defendant's arrest and found that there was, based on the video footage and identifications of defendant by Castillo and Gomez.

¶ 13    In September 2019, immediately prior to trial, defendant filed a motion to reconsider the denial of his amended motion to quash arrest and suppress evidence, based on the recently-decided case of *People v. Bass*, 2019 IL App (1st) 160460, in which the appellate court found that the Illinois Constitution prohibited warrantless arrests pursuant to an investigative alert. In response, the State argued that the appellate court's conclusion in *Bass* contradicted the Illinois Supreme Court's long-standing precedent that a police officer may arrest an individual if the officer has reasonable cause to believe that the individual committed a crime. The State further argued that, since the appellate court's decision in *Bass* contradicted Illinois Supreme Court

precedent, the trial court in this case must follow that precedent and decline to follow *Bass*. Finally, the State argued that, even if the appellate court correctly decided *Bass*, the trial court should apply the good-faith exception to the exclusionary rule, as the police had a reasonable belief that they were acting in accordance with the law.

¶ 14    The trial court denied defendant's motion to reconsider, observing that the Chicago Police Department had used investigative alerts for at least 90 years. Thus, the trial court concluded that, even if *Bass* were binding on the trial court, the good-faith exception to the exclusionary rule applied.

¶ 15    Additionally, prior to trial, defense counsel moved *in limine* to prohibit the State from arguing that defendant was "part of a team." Defense counsel claimed that this analogy oversimplified and misstated the evidence and lowered the State's burden of proof. The State responded that since it had charged defendant with attempted murder and first-degree murder under an accountability theory, and since the evidence at trial would demonstrate that defendant acted in concert with his co-offenders, the State could properly argue that defendant was part of a team. The trial court agreed with the State and denied the motion.

¶ 16                                    II. Trial

¶ 17                              A. Trial Testimony

¶ 18    At trial, the State presented the testimony of a number of witnesses, including occurrence witnesses Freddy Sotelo and Lissette Avila, who were present at the store at the time of the incident; Castillo, Betancourt, and Esteban Perez, who were the surviving members of the group inside the store at the time of the incident; and Detective Morales. The State also played video surveillance footage from the store, as well as video from defendant's interview with police. The evidence at trial established the following.

¶ 19    On March 25, 2015, Sotelo was working at the Dunkin' Donuts store after school, while Avila, his friend, sat nearby completing homework. The store was located in a strip mall, along with several other businesses, including a dollar store.[2] At approximately 4:30 p.m., a group of regular customers—Castillo, Betancourt, Perez, and Muneton—entered the store, where they purchased coffee and sat at a table near the store's front window. Approximately an hour later, a group of six men, including defendant and codefendants Gonzalez and Gill, walked past the store, but stopped when they noticed Castillo's group inside; one of the men outside pointed at Muneton. The group inside appeared to become frightened, and the group outside entered the store. Castillo, Muneton, and Perez all moved away from the door and ran behind the counter, to the employee section of the store;[3] the men from outside followed, with some jumping over the counter. Castillo became trapped near the store's drive-through window, where defendant and several other men beat him with broomsticks, fists, and other nearby objects. Codefendant Gill, meanwhile, chased Perez and Muneton through the store's back door and into an alley, where he fired three gunshots, killing Muneton. After beating Castillo, defendant went to the back door, which he held open as Gill ran back inside and through the store. After the men left the store, Sotelo called the police. Castillo, Betancourt, Sotelo, and Avila identified defendant in photo arrays, and defendant's DNA was found on a straw which he discarded during the altercation. At the time of his arrest, defendant was also wearing the same jacket as appeared in the video footage.

¶ 20    During his testimony, Castillo testified that he had a pending criminal contempt charge against him for failure to appear in court when he was subpoenaed in this case, as well as a pending felony charge for resisting arrest and a probation violation. Castillo testified that he

---

[2] The record does not specify the type of dollar store.
[3] Betancourt testified that he remained seated, then left through the store's front door.

hoped the State would dismiss his criminal contempt charge in exchange for his testimony and that he hoped his testimony would "help [him] out" on his pending resisting arrest charge and "help [him]" with his probation violation.

¶ 21    In response, the prosecutor asked, "I told you *** that there were no promises or deals to be made in exchange for your testimony today, correct?" Castillo agreed. The prosecutor then asked, "And I in fact was specific and said all I want you to do was tell the truth and nothing more, right?" Castillo again agreed. In addition, the prosecutor asked Castillo whether anyone from the State's Attorney's office promised him anything with respect to older cases in exchange for his testimony in this case, and Castillo testified that no one had.

¶ 22    While defendant did not testify at trial, as noted, a video of his interview with police was played for the jury. In the interview, defendant stated that he had been with his brother (codefendant Gill) and several other individuals, commemorating the anniversary of a friend who had died. After drinking a large amount of alcohol, one of the individuals said, "let's go walk," which meant "looking for trouble." Defendant decided to accompany the group, since he needed to purchase cigarettes anyway and did not wish to leave his brother. After purchasing cigarettes at a store in a strip mall, the group passed a Dunkin' Donuts store, where one of the men (named "Bizzy") tapped on the window and claimed to observe one of his enemies inside. Defendant looked toward the store's window and observed "King Sneaks," who owed him money, inside. Codefendant Gill then said, "I got this" and "it's time for me to prove myself."

¶ 23    The group entered the store, where defendant and King Sneaks exchanged words about money. King Sneaks then ran behind the counter, and defendant, Bizzy, and another individual started to beat King Sneaks near the drive-through area. Defendant then observed Gill pistol-whipping Muneton. Defendant asserted that he did not know that Gill had a firearm and that his

brother "didn't tell me s***." Gill chased Muneton out the back door and defendant followed, where he heard Gill shoot Muneton.

¶ 24    After the shooting, defendant and Gill ran through the front door. Referring to the shooting, defendant stated that "all that" was unnecessary since they had six men with them and easily could have "whooped" the group in the store. Defendant also stated that when he observed his brother draw a firearm, defendant believed Gill was going to pistol-whip someone but not shoot anyone.

¶ 25                                B. Closing Argument

¶ 26    During its closing argument, the State argued that defendant was accountable for his brother's conduct. As part of the closing, the prosecutor explained that the law provided that a person could be accountable for another's conduct since "the law acknowledges *** that what one person won't do alone, two or more people will." The prosecutor continued, "[w]hen a little brother is trying to prove himself and doesn't have the guts to go into the Dunkin Donuts by himself, *** he will take his brother, the muscle, Too Tall, behind him to make sure he gets it done to prove himself. So the law acknowledges that when you act as a team, you are all responsible for what happens." The prosecutor then drew an analogy with the Chicago Cubs, explaining, "when there is a World Series and the Cubs win the [W]orld [S]eries, everybody on the team gets the ring. It's the same in the law. You are in for a penny, you are in for a pound. You are responsible for everything you are doing when you are acting as a group together, and that is not more evident than it is in this case, ladies and gentlemen." Later in the closing argument, the prosecutor argued that defendant was "part of every single thing that's happening in this Dunkin Donuts, especially when it comes to his brother," pointing to defendant's following his brother and holding the back door open for him. The prosecutor argued that the

evidence showed "brother backing up the little brother, helping to make sure that he's able to shoot, backing him up the whole time, acting as his enforcer, still part of the team as they run out together and running out of the store together."

¶ 27    During defendant's closing argument, defense counsel argued that defendant was not accountable for his brother's conduct. Defense counsel contended that defendant and his brother were acting separately and that "there's no evidence that [defendant] knew what anyone else planned to do, especially not his brother." Defense counsel argued that "[t]his is not a team with roles and positions, and there's not a coach who masterminded a play. It's a loose association of people that were hanging out. They didn't have positions like a quarterback and a receiver, and this guy is going to do this, and this guy is going to be the lookout, and this guy is the get-away driver. There's nothing like that. It's guys, young men, walking and having a conflict, individual, separate, simultaneous conflicts."

¶ 28    During the State's rebuttal argument, the prosecutor asked, "[w]hat world are we living in where we can just say, oh, you know what, I want to judge all my actions in a vacuum? Seriously, where can we do that? How can we do that?" The prosecutor noted that the judge would be instructing the jury to use its own common life experiences and continued, "[w]here can we say, by the way, you know, *** say you are part of a team and you played great, and the rest of the team let you down and you lose the game, you are still—you are not still a winner. It doesn't work that way. You don't get to distance yourself when things break bad. That's ridiculous. This doesn't work that way in the real world."

¶ 29                              C. Jury Instructions

¶ 30    Following closing arguments, the trial court instructed the jury, explaining when a defendant is accountable for another's conduct. The instruction given to the jury provided:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

¶ 31    During deliberations, the jury sent out the accountability instruction with a written inquiry, which stated, "We need to be clear what 'an offense' is referring to [ ]i.e., anything legally considered 'an offense,' or is this phrase referring to the offense of first-degree murder (as well as attempted first-degree murder)." The phrase "an offense" was circled all three times it appeared on the jury's instruction.

¶ 32    The trial court and the parties discussed how the court should answer the question. Defense counsel suggested that the trial court should instruct the jury to continue deliberating. The State, however, argued that the jury's inquiry was a question of law and that the trial court should answer it. In response to the prosecutor, the trial court stated, "your argument has some merit, but I'm not sure if I understand what this question means ***." The prosecutor then asserted that he believed the jury was asking whether the phrase "an offense" in the jury's instruction referred to only the charged offenses or could refer to uncharged offenses as well. The prosecutor further asserted that the pattern accountability instruction's committee note answered that question, suggesting that the trial court's answer could simply quote the committee note. The trial court then read the committee note. Thereafter, the trial court found that the jury's question merited a response and stated, "I think I'm going to use this committee note." The trial court answered the jury's question, sending back a note stating "[t]he word 'an' refers to when

the offense is different than the planned and intended offense, but done in furtherance of it."

¶ 33 After deliberations, the jury found defendant guilty of three counts of first-degree murder with respect to Muneton and not guilty of attempted first-degree murder with respect to Perez. Defendant then moved for a new trial, arguing that the trial court erred when it denied defendant's amended motion to quash arrest and suppress evidence and defendant's motion *in limine* to prohibit the State from arguing that defendant was part of a team. In addition, defendant argued that the trial court erred when it based its answer on the pattern accountability instruction's committee note, contending that the trial court's answer was "overly broad and confusing." At a hearing on the motion, the trial court denied the motion. In denying the motion, the trial court addressed defendant's argument that the court's answer was broad and confusing, finding that the answer was proper since it quoted the pattern instruction's committee note and was therefore an accurate statement of law.

¶ 34                                   III. Sentencing

¶ 35 The trial court ordered a presentence investigation report (PSI) for defendant, which indicated that defendant was 23 at the time of the offense, had graduated high school, and was supported by his family and girlfriend. The PSI provided that defendant had been diagnosed with ADHD at a young age, that he met with a mental health professional throughout his childhood, and that he reported having suicidal thoughts before and after his conviction. The PSI further summarized his substance use, stating that he began smoking marijuana daily when he was 12 years old and began drinking alcohol on the weekends when he was 13 years old. Finally, the PSI indicated that defendant had previously been convicted and sentenced to 1 year of supervision for reckless conduct, 6 months of supervision for violating a protection order, and 24 months of probation for attempted robbery.

¶ 36    At the sentencing hearing, the State presented evidence that, while in custody and awaiting trial, defendant stabbed two inmates with a shank. The State also presented evidence that on a separate occasion, a shank was recovered from defendant's clothing while in custody and awaiting trial. In addition, the State presented evidence of defendant's gang membership,[4] including defendant's admission to the police that he belonged to the Latin Stylers and a tattoo on his forearm which read "LS."

¶ 37    The parties also made arguments in aggravation and mitigation. During the State's argument, defendant was removed from the courtroom after gesturing to the prosecutor and "say[ing] something to the effect of I'm going to get you." Defendant did not give a statement in allocution, but defense counsel noted that defendant's brother, codefendant Gill, had been sentenced to 31 years[5] after pleading guilty and requested a lower sentence since defendant was not the actual shooter. The trial court, however, observed that Gill pleaded guilty, expressed some remorse, did not have a criminal background, and was not found with shanks while in custody.

¶ 38    After hearing the parties' arguments, the trial court stated that it had considered the PSI, the evidence, that defendant did not give an allocution statement, all the statutory aggravating and mitigating factors, defendant's history and character, and the seriousness of the offense. The trial court found that "the defendant's role in the murder here is decidedly more than your traditional accomplice. He did more than just hold the door for his brother. He was actively

---

[4] Gang evidence was not presented during the trial itself, as the trial court granted the defense's motion to exclude such evidence, finding it more prejudicial than probative.

[5] During the sentencing hearing, defense counsel stated that defendant's brother was sentenced to 31 years. As defendant notes in his opening appellate brief, however, the Illinois Department of Corrections' website indicates that defendant's brother was sentenced to 29 years' imprisonment. Illinois Department of Corrections, *Individual in Custody Search: Y38726—Gill, Stephon*, https://www.idoc.state.il.us/subsections/search/inms_print.asp?idoc=Y38726 (last visited Aug. 8, 2023); *People v. Jimerson*, 404 Ill. App. 3d 621, 634 (2010) (courts may take judicial notice of public records).

involved, he provides a motive, a gang motive, he's the leader, he's the older and, quote, unquote, wiser person \*\*\*, and he facilitates his brother in, quote, proving himself, unquote." The trial court accordingly sentenced defendant to 35 years with a 15-year firearm enhancement for a total of 50 years' imprisonment.

¶ 39 Defendant filed a motion to reconsider his sentence, which was denied. This appeal follows.

¶ 40 ANALYSIS

¶ 41 On appeal, defendant argues that his arrest was unconstitutional and that the trial court erred when it denied his motion to quash arrest and suppress evidence. Defendant also argues that the State erred during its redirect examination of Castillo, that the prosecutors committed misconduct during closing arguments, and that the trial court erred when it answered the jury's question. Finally, defendant argues that the trial court considered improper aggravating factors when sentencing defendant and that defendant's sentence was excessive. We consider each argument in turn. We begin, however, with defendant's nonconstitutional arguments. See *People v. Hampton*, 225 Ill. 2d 238, 244 (2007) ("Constitutional issues should be addressed only if necessary to decide a case.").

¶ 42 I. Questioning of Castillo

¶ 43 Defendant contends that the State improperly questioned Castillo during its redirect examination, using hearsay evidence and vouching for Castillo's credibility. Defendant concedes that trial counsel did not object to this questioning during trial, but claims that trial counsel's failure to object to the State's questioning constituted ineffective assistance of counsel.

¶ 44 The United States Constitution and the Illinois Constitution both guarantee criminal defendants the right to effective assistance of counsel. U.S. Const., amend. VI; Ill. Const. 1970,

art. 1, § 8; *People v. Hale*, 2013 IL 113140, ¶ 15. To prevail on an ineffective assistance claim, a defendant must show that (1) counsel's performance was deficient and (2) the defendant suffered prejudice depriving him of a fair trial. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). A defendant suffers prejudice if, but for trial counsel's alleged errors, there is a reasonable probability that the outcome at trial would have been different. *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶ 89. A "reasonable probability" is defined as "a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Charles*, 2018 IL App (1st) 153625, ¶ 38. "A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim." *Id.* (citing *People v. Morgan*, 187 Ill. 2d 500, 529-30 (1999)). Thus, if a reviewing court finds that a defendant was not prejudiced, it need not consider whether counsel's performance was deficient. *People v. Randall*, 2016 IL App (1st) 143371, ¶ 58.

¶ 45    In this case, defendant claims that trial counsel was ineffective for failing to object to the State's questioning of Castillo. According to defendant, the State improperly used hearsay evidence and vouched for Castillo's credibility during its redirect examination. Both of these alleged errors occurred when the State questioned Castillo as to any deals which had been made in exchange for his testimony.

¶ 46    During the defense's cross-examination, Castillo agreed with defense counsel's questions as to whether he hoped his testimony would result in the dismissal of his criminal contempt charge and "help [him]" with his other pending charges. In response, during the State's redirect examination, the prosecutor asked, "I told you *** that there were no promises or deals to be made in exchange for your testimony today, correct?" Castillo agreed. The prosecutor then asked, "And I in fact was specific and said all I want you to do was tell the truth and nothing

more, right?" Castillo again agreed. In addition, the prosecutor asked Castillo whether anyone from the State's Attorney's office promised him anything with respect to older cases in exchange for his testimony in this case, and Castillo testified that no one had.

¶ 47    First, as to the issue of whether this line of questioning included improper hearsay evidence, we agree with defendant that the prosecutor's references to the specific contents of his conversation with Castillo constituted hearsay, and the State does not argue otherwise on appeal. See *People v. McNeal*, 405 Ill. App. 3d 647, 666 (2010) (hearsay is an out-of-court statement offered to prove the truth of the matter asserted). We cannot find, however, that trial counsel's failure to object to this hearsay constituted ineffective assistance of counsel.

¶ 48    In addition to the improper hearsay, the prosecutor elicited non-hearsay testimony to establish that Castillo was not offered any deals, through his question as to whether anyone from the State's Attorney's office had made him any promises with respect to older cases in exchange for his testimony. Thus, even if trial counsel had objected to the specific phrasing at issue here, the prosecutor could easily have rephrased the question to avoid any hearsay and received the same responses. Furthermore, we cannot find that the mere fact that the jury heard hearsay testimony as to the contents of the conversation between the prosecutor and Castillo undermines our confidence in the trial's outcome. See *Charles*, 2018 IL App (1st) 153625, ¶ 38. This is especially the case here, where the prosecutor's questions were intended to correct an unfavorable inference left by the defense's cross-examination. See *People v. Manning*, 182 Ill. 2d 193, 216 (1998) (where the door to a subject is opened by defense counsel on cross-examination, the State may question the witness on redirect to remove or correct unfavorable inferences left by the cross-examination). Thus, since defendant did not suffer any prejudice, we cannot find that defense counsel was ineffective for failing to object to the prosecutor's hearsay

testimony. See *Randall*, 2016 IL App (1st) 143371, ¶ 58.

¶ 49    We similarly find unpersuasive defendant's contention that the State's questioning improperly vouched for Castillo's credibility. It is well-settled that a prosecutor may not express personal beliefs or opinions, or invoke the integrity of the State's Attorney's office, to vouch for the credibility of a witness. *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66; *People v. Boling*, 2014 IL App (4th) 120634, ¶ 126; *People v. Lee*, 229 Ill. App. 3d 254, 260 (1992).

¶ 50    Here, through his questioning, the prosecutor elicited testimony demonstrating that he wanted Castillo to tell the truth and that Castillo was not offered any deals for his testimony. The prosecutor did not state or elicit testimony demonstrating that he believed Castillo was, in fact, telling the truth. We thus cannot find that this questioning constituted the prosecutor's personal opinion as to Castillo's credibility. See *People v. Garcia*, 231 Ill. App. 3d 460, 473 (1992) (finding that questioning which revealed that a witness' plea deal required him to tell the truth did not constitute improper vouching for the credibility of the witness, as such testimony "has only revealed that the witness agreed to tell the truth; the prosecutor has not expressed a personal opinion as to whether the witness has actually complied with the agreement by telling the truth"). We note that the cases cited by defendant in support of his argument concern comments made during closing argument, when the prosecutor is addressing the jury directly. See *Boling*, 2014 IL App (4th) 120634, ¶ 125 (arguing to the jury that " 'I do think [the witness'] statements are credible. They are believable. They are honest.' "); *People v. Lee*, 229 Ill. App. 3d 254, 259-60 (1992) (arguing to the jury that the witness was " 'extremely honest in my humble opinion,' " " 'is telling you the truth,' " and " 'was candid and honest' "). Unlike those cases, the prosecutor in the instant case did not make any comments indicating his belief that Castillo was being truthful or otherwise vouching for his credibility. We accordingly cannot find that defense counsel was

ineffective for failing to object to the prosecutor's questions. See *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless objection.").

¶ 51                                    II. Closing Arguments

¶ 52    Defendant next argues that the prosecutors misstated the law when, during closing arguments, the prosecutors argued that defendant was accountable for his brother's conduct since defendant and his brother were part of a team like the Chicago Cubs.

¶ 53    Prosecutors are afforded wide latitude during closing arguments. *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). A prosecutor may argue facts and reasonable inferences drawn from the evidence, even if these inferences are unfavorable to the defendant. *People v. Anderson*, 407 Ill. App. 3d 662, 667 (2011). A prosecutor may not, however, misstate the law, misstate the evidence, or mislead the jury as to what inferences it may draw from the evidence. *People v. McGee*, 2015 IL App (1st) 130367, ¶ 64; *People v. Wilson*, 92 Ill. App. 3d 370, 383 (1981). Closing arguments must be reviewed in their entirety, and the challenged remarks must be viewed in context. *People v. Macri*, 185 Ill. 2d 1, 62 (1998). A prosecutor's comments warrant reversal only if they substantially prejudice a defendant. *People v. Caffey,* 205 Ill. 2d 52, 131 (2001). Courts find substantial prejudice when they cannot determine whether the jury found against defendant due to a prosecutor's comments or due to the evidence. *Id.*

¶ 54    We observe that there is a split in authority as to which standard we should apply when reviewing a challenge to a prosecutor's closing arguments. This split stems from two cases decided by our supreme court; in *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), our supreme court suggested that the *de novo* standard applies, and in *People v. Blue*, 189 Ill. 2d 99, 128 (2000), our supreme court suggested that the abuse of discretion standard applies. We need not

decide which standard applies, however, since defendant's argument fails under either standard. See *People v. Potts*, 2021 IL App (1st) 161219, ¶ 254.

¶ 55    Here, defendant challenges the State's references to defendant being part of a "team" during its closing and rebuttal arguments. Defendant claims that, although members of a team have a common design, they do not have a common *criminal* design. Therefore, defendant contends that when the prosecutors asserted that defendant was accountable for his brother's actions since he and his brother were on a team like the Chicago Cubs, the prosecutors misstated the State's burden to prove that defendant and his brother had a common criminal design. We do not find this argument persuasive.

¶ 56    A prosecutor is permitted to give examples illustrating the application of the law to the facts, and "where the prosecutor correctly states the law, there can be no prejudice to the opposing party." *People v. London*, 256 Ill. App. 3d 661, 665 (1993) (citing *People v. Steffens*, 131 Ill. App. 3d 141, 151 (1985)); see also *People v. Nunn*, 357 Ill. App. 3d 625, 639 (2005); *People v. Jackson*, 333 Ill. App. 3d 962, 969-70 (2002). In this case, the prosecutor read the accountability instruction to the jury and explained that "what the law acknowledges is that what one person won't do alone, two or more people will," and "when you act as a team, you are all responsible for what happens." The prosecutor then used the Chicago Cubs winning the World Series as an example of the concept of "[y]ou are in for a penny, you are in for a pound." Thus, the "team" analogy and use of the Chicago Cubs winning the World Series as an example of the concept of group accountability properly illustrated the applicable law, even if not all teams share a common criminal design. Indeed, the use of such a "team" analogy has previously been affirmed by this court. See *People v. Walls*, 2022 IL App (1st) 200167, ¶¶ 47-49 (finding the prosecutor's basketball analogy to accurately reflect the law, including a statement that " 'I'm a

basketball player and I have the ball and I pass it to someone and he scores, who scores there? The team scores. Not just me, not just him. The team scores.' ").

¶ 57    We also note that the defense itself effectively addressed the "team" analogy in its closing, arguing that the group entering the Dunkin' Donuts was *not* acting like a team: "This is not a team with roles and positions, and there's not a coach who masterminded a play. It's a loose association of people that were hanging out. They didn't have positions like a quarterback and a receiver, and this guy is going to do this, and this guy is going to be the lookout, and this guy is the get-away driver. There's nothing like that. It's guys, young men, walking and having a conflict, individual, separate, simultaneous conflicts." To the extent that the "team" analogy could lead a jury to any improper inferences, then, defense counsel's argument effectively dispelled any possible misunderstanding. See *Walls*, 2022 IL App (1st) 200167, ¶ 51 (noting that defense counsel using a basketball analogy to rebut the State's basketball analogy was "the very essence of argument," as "[w]hile the State effectively argued the basketball analogy, the defense skillfully poked holes into that logic, thus reducing any potential prejudice").

¶ 58    We find unpersuasive defendant's claim that the State was attempting to prove "guilt by association" through its use of the "team" analogy. First, defendant's reliance on *People v. Ong*, 94 Ill. App. 3d 780 (1981), does not support his argument. There, the primary basis for error was the prosecutor's—and the trial court's—equating of the concepts of accountability and accomplice liability, which was an inaccurate statement of the law. *Id.* at 789-90. While the appellate court also found the prosecutor's comments characterizing the defendant and the codefendants as " 'common drinking buddies' " who were like " 'peas in a pod' " to be inappropriate, the court expressly noted that these remarks did not, in themselves, rise to the level of reversible error. *Id.* at 790. More importantly, in this case, the State made it clear that it

was defendant's active involvement in the altercation which led to defendant's accountability, not merely his connection with his brother.

¶ 59 Furthermore, to the extent that defendant contends that the State did not specifically identify the subject of the "common criminal design," that claim is belied by the evidence in the record. As an initial matter, one of the first-degree murder charges was based on felony murder, which expressly listed a predicate offense—mob action. Additionally, during closing arguments, the State focused on the fact that codefendant Gill had stated that he wanted to "prove himself" upon noticing the group inside the Dunkin' Donuts, and argued that defendant was present every step of the way to "back him up." One of the prosecutors, for example, contended that defendant and his brother planned to commit the offense of mob action before entering Dunkin' Donuts: "He said he knew somebody in there that owed him some money, he was going to go beat him up and his brother was going to go in there and prove himself ***." The prosecutor continued, "You knew that their intent when they went into Dunkin Donuts was to, at the very least, disturb the peace, but definitely to use force and violence."

¶ 60 After reviewing the closing arguments in their entirety and viewing the prosecutors' "team" analogies in context, we cannot find that these analogies represented an inaccurate statement of the law or substantially prejudiced defendant. Even though not all teams have the goal of committing crimes, the prosecutors made clear that the State's burden was to prove that defendant and his brother had planned to commit a crime and that the evidence proved as much. Thus, we cannot say it is impossible to determine whether the jury convicted defendant because of the prosecutors' comments or because of the evidence. See *Caffey,* 205 Ill. 2d at 131.

¶ 61                                   III. Jury Question

¶ 62   Defendant next contends that the trial court erred when it answered the jury's question as

to the accountability instruction. "Jurors are entitled to have their questions answered." *People v. Reid*, 136 Ill. 2d 27, 39 (1990). Accordingly, the general rule is that the trial court has the duty to provide instruction to the jury "where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). A trial court may exercise its discretion and decline to answer a jury's question, however, where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, where the jury's inquiry involves a question of fact, or where the giving of an answer would cause the trial court to express an opinion which would likely direct a verdict one way or another. *Id.* at 228.

¶ 63    "When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *Id.* at 229. If the question asked is unclear, it is the trial court's duty to seek clarification. *Id.* "The failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error." *Id.*

¶ 64    In this case, the jury received the following instruction concerning accountability:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

¶ 65    During deliberations, the jury sent out the accountability instruction with a written inquiry, which stated, "We need to be clear what 'an offense' is referring to [ ]i.e., anything

legally considered 'an offense,' or is this phrase referring to the offense of first-degree murder (as well as attempted first-degree murder)." The phrase "an offense" was circled all three times it appeared on the jury's instruction. After discussion of the question with counsel, and over defense counsel's objection, the trial court decided to answer the question by quoting from the pattern instruction's committee note. We cannot find any error in the trial court's decision to answer the question or the substance of its answer.

¶ 66    Defendant first contends that the trial court should have sought clarification where, upon initially reviewing the question, the court indicated that "I'm not sure if I understand what this question means." Since the trial court has discretion in deciding whether to answer a jury question, we review its decision to do so for an abuse of discretion. *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 45. Here, while the trial court initially indicated that it was unclear as to what the jury's question meant, the record indicates that the court understood the question after discussing it with the parties and reading the pattern accountability instruction's committee note. After its discussion and reading the note, the trial court concluded that the jury's question merited a response and was confident that the committee note would answer the question. Thus, we cannot find that it was an abuse of discretion for the trial court to decide to answer the jury's question without first seeking additional clarification. See *id.*

¶ 67    Defendant additionally claims that the trial court's answer, namely, quoting the committee note, did not answer the question "with specificity and accuracy" (*Childs*, 159 Ill. 2d at 229), as required. While the decision to answer a jury question is one which is reviewed for an abuse of discretion, the question of whether the trial court's ultimate answer was correct is a question of law which we review *de novo*. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 16.

¶ 68    Here, the instruction given to the jury was based on the pattern jury instruction defining

accountability. See Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03). The pattern instruction provides:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of [(an) (the)] offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of [(an) (the)] offense.

[The word 'conduct' includes any criminal act done in furtherance of the planned and intended act.]" *Id.*

The committee note to IPI Criminal No. 5.03 provides, in relevant part: "Use the bracketed word 'an' and use the bracketed paragraph when the offense is different than the planned and intended offense, but done in furtherance of it." *Id.*, Committee Note.

¶ 69    After discussion with the parties, and over defense counsel's objection, the trial court answered the jury's question with language mirroring the committee note: "[t]he word 'an' refers to when the offense is different than the planned and intended offense, but done in furtherance of it." We find that this response was appropriate, as it provided a specific and accurate answer to the jury's question.

¶ 70    The parties agree that the phrase "an offense" has two different meanings within the instruction—the first reference is to the charged offense, while the other two are to some different offense. Defendant claims that the trial court's note, which did not explain the two different meanings, therefore did not provide a specific and accurate answer to the jury's question. Defendant fails to recognize, however, that jury instructions are not to be read in isolation but must be construed as a whole. *People v. Parker*, 223 Ill. 2d 494, 501 (2006); see also *People v. Hilson*, 2023 IL App (5th) 220047, ¶¶ 71-72 (considering jury instructions as a

whole in determining whether trial court's answer to a jury question was proper). Here, the conduct for which the State was attempting to hold defendant responsible was Gill's killing of Muneton and the alleged attempted killing of Perez. Thus, the only logical reading of the first reference to "an offense" is that it applies to the charged offenses for which defendant was allegedly responsible. We therefore cannot find that the trial court was required to expressly specify that its answer applied only to the latter two uses of "an offense." We also observe that the language used by the trial court was the same language included in the pattern instruction's committee note, adding further support for our conclusion that the trial court properly answered the jury's question.

¶ 71 Moreover, the trial court's answer addressed the most important aspect of the jury's question—clarifying whether the term "an offense" should be equated with "the charged offense." If the jury had erroneously believed that "an offense" meant only the charged offense, that would have eliminated the theory of accountability which the State was pursuing, namely, the common-design rule. See *People v. Fernandez*, 2014 IL 115527, ¶ 13 (under the common-design rule, if two or more people engage in a common criminal design or agreement, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement). In other words, if the jury had interpreted the instruction to refer only to the charged offense, it could have found defendant accountable only if he had intended to promote or facilitate the commission of the charged offense and had knowingly solicited, aided, abetted, agreed to aid, or attempted to aid in the planning or commission of the charged offense. This is not an accurate statement of the applicable law, and the trial court properly corrected that misapprehension through its answer.

¶ 72 We also cannot find that the trial court's answer deprived defendant of his right to present

a defense by inviting the jury to convict defendant under a theory which was not presented or argued by the State. An answer to a jury question may not submit new theories of guilt that defendant never had the chance to address. *People v. Millsap*, 189 Ill. 2d 155, 161 (2000). Here, defendant claims that the trial court's answer "invited the jury to come up with any offense that it believed [defendant] committed or planned to commit, and convict [defendant] of first degree murder under that theory." We do not find this argument persuasive.

¶ 73    Under the common-design rule, to hold a defendant accountable for another's conduct, the evidence must demonstrate that a defendant "attache[d] himself to a group bent on illegal acts with knowledge of its design." *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 49. " 'With knowledge of its design' means only that a person who attached himself to a group knows that the group intended to engage in criminal behavior of some kind—nothing more specific is required." *Id.* (quoting *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 44). In addition, the pattern accountability instruction does not require that the State identify which offense that a defendant planned to commit but uses the purposefully broad phrase "an offense." See IPI Criminal No. 5.03. The trial court's answer did not alter this instruction in any way.

¶ 74    Here, defendant had the chance to respond to the State's theory of guilt by contending that he and his brother did not plan to commit any criminal offense. Further, defense counsel argued exactly that, when, during closing arguments, he argued that defendant and his brother acted separately and that "there's no evidence that [defendant] knew what anyone else planned to do, especially not his brother." Defendant was well aware of the State's arguments—and any potential "offenses" which may have resulted from the altercation at Dunkin' Donuts—and had a full opportunity to counter these arguments, unlike in the cases relied on by defendant in support of his argument. See *People v. Williams*, 2013 IL App (4th) 110936, ¶ 27 (finding the trial

court's answer improper where it provided the jury with a definition of an uncharged offense); *Millsap*, 189 Ill. 2d at 163-65 (same). We therefore find that the trial court's answer did not submit a new theory of guilt or violate defendant's right to make a closing argument.

¶ 75                                    IV. Sentence

¶ 76     Defendant also contends that the trial court considered improper aggravating factors when sentencing defendant and that his sentence was excessive.

¶ 77                              A. Improper Aggravating Factors

¶ 78     As to the issue of whether the trial court considered improper aggravating factors at sentencing, defendant acknowledges he forfeited this argument since he did not raise the issue in his motion to reconsider his sentence. Defendant asks us to review the sentencing decision for plain error, or in the alternative, defendant argues that his counsel was ineffective for failing to preserve this argument.

¶ 79     Under the plain-error doctrine, plain errors affecting substantial rights may be raised on appeal even though they were not raised before the trial court. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prove that a plain error occurred at sentencing, a defendant must demonstrate that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious that it denied defendant a fair hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). A defendant, however, must first prove that a clear or obvious error occurred. *Id.* Without error, there can be no plain error. *People v. Mitchem*, 2019 IL App (1st) 162257, ¶ 37. Thus, we first consider whether there was a clear or obvious error.

¶ 80     A trial court's sentencing decision is entitled to great deference. *People v. Snyder*, 2011 IL 111382, ¶ 36; *People v. Latona*, 184 Ill. 2d 260, 272 (1998). Reviewing courts should not reweigh factors that the trial court considered nor disturb a sentence that is within the statutory

range unless the trial court abused its discretion. *People v. Alexander*, 239 Ill. 2d 205, 214-15 (2010). With that said, a trial court's exercise of discretion is not proper when it is founded on a misconception. *People v. Zapata*, 347 Ill. App. 3d 956, 964 (2004); *People v. Ross*, 303 Ill. App. 3d 966, 984-85 (1999). An exercise of discretion based on a manifest error of fact is an abuse of discretion. See *People v. Johnson*, 227 Ill. App. 3d 800, 817 (1992) (finding that the trial court abused its discretion and remanding for a new sentencing hearing since the trial court during the sentencing hearing inferred without evidence that the crime was drug-related).

¶ 81    When a sentencing judge relies on aggravating factors unsupported by evidence in the record, we must vacate the defendant's sentence and remand for resentencing. *Zapata*, 347 Ill. App. 3d at 964; *Ross*, 303 Ill. App. 3d at 984-85. We must do so unless we conclude from the record that the weight given to the improperly considered evidence was so insignificant that it did not affect the defendant's sentence. *People v. Walker*, 392 Ill. App. 3d 277, 301 (2009); *Ross*, 303 Ill. App. 3d at 984.

¶ 82    Here, at the sentencing hearing, the trial court stated, "the defendant's role in the murder here is decidedly more than your traditional accomplice. He did more than just hold the door for his brother. He was actively involved, he provides a motive, a gang motive, he's the leader, he's the older and, quote, unquote, wiser person ***, and he facilitates his brother in, quote, proving himself, unquote." Defendant contends that with these remarks, the trial court found that defendant was the leader of Gill, the principal shooter; facilitated the shooting; and had an independent gang motive, none of which were supported by evidence in the record. We do not find this argument persuasive.

¶ 83    First, we must note that, contrary to defendant's suggestion, there is no indication that the trial court meant that defendant facilitated or led the shooting itself. Instead, the trial court

referenced Gill's desire to "prov[e] himself," which was a statement Gill made immediately prior to entering the Dunkin' Donuts, thereby demonstrating that the trial court was discussing the altercation as a whole. The evidence presented at trial established that defendant did, in fact, have an active and visible role in the altercation. When he observed Castillo inside the store, he made a comment about Castillo owing him money and, upon entering the store, beat Castillo in the store's drive-through area. Moreover, upon observing Gill pistol-whipping Muneton, defendant went to him, ushering him back inside and out of the store. Even if we accept defendant's framing of the situation—that this was not his idea and that he was a mere participant—once the decision was made to enter the store, the evidence certainly supports an inference that defendant assumed a leadership role, which distinguishes this case from the case relied on by defendant. See *People v. Joe*, 207 Ill. App. 3d 1079, 1086 (1991) (finding error where the trial court found that the defendant had " 'incorporated' " his younger brother in the offense but there was no evidence that the brother agreed to participate at the defendant's urging). We therefore cannot find that the trial court's comments were unsupported by the evidence.

¶ 84    Additionally, we find no support for defendant's contention that the trial court found that defendant provided an *independent* gang motive. Instead, the trial court found that defendant provided "*a* gang motive" (emphasis added). There was substantial evidence presented at sentencing concerning defendant's gang involvement, including his admission that he belonged to a gang. Furthermore, the evidence presented at sentencing established that those involved in the altercation were members of different gangs, and further established that Gill was a more recent member of the gang to which defendant belonged and desired to "prov[e] himself" by engaging with those inside the Dunkin' Donuts. Thus, the evidence supported an inference that

there was a gang motive to the altercation, and we therefore cannot find that the trial court's comment that defendant provided "a gang motive" was improper.

¶ 85    Examining the trial court's comments, we cannot find that the trial court relied on aggravating factors which were unsupported by the evidence and, therefore, the trial court did not commit a clear and obvious error. As noted, where there is no error, there can be no plain error. See *Hillier*, 237 Ill. 2d at 545; *Mitchem*, 2019 IL App (1st) 162257, ¶ 37. In addition, since the trial court did not err, we find that defense counsel was not ineffective in failing to preserve this issue for appeal. See *People v. Coleman*, 158 Ill. 2d 319, 349 (1994).

¶ 86                                    B. Excessive Sentence

¶ 87    We similarly find unpersuasive defendant's contention that his sentence was excessive. A trial court's sentencing decision is entitled to great deference and will not be altered on appeal absent an abuse of discretion. *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). A trial court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion standard is highly deferential to the trial court. *Davis v. Kraff*, 405 Ill. App. 3d 20, 28 (2010). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *Jackson*, 375 Ill. App. 3d at 800.

¶ 88    Here, defendant was sentenced to 35 years for first-degree murder, along with a 15-year firearm enhancement, for a total sentence of 50 years. Under the law, defendant could have received a minimum sentence of 35 years or a maximum sentence of 75 years. See 730 ILCS 5/5-4.5-20(a) (West 2014); 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2014). Thus, defendant's 50-year sentence falls within the statutory range. See *Jackson*, 375 Ill. App. 3d at 800.

¶ 89    Defendant nevertheless argues that his *de facto* life sentence is excessive, since it does not reflect the degree of harm he caused and does not account for his rehabilitative potential. First, this court has recognized that, so long as a defendant's prison sentence is not otherwise an abuse of discretion, it will not be found improper because it amounts to a *de facto* life sentence. *People v. Martin*, 2012 IL App (1st) 093506, ¶ 50. Moreover, "for sentencing purposes, a defendant found guilty under the common-design rule is deemed as culpable as the principal unless a statutory exception exists or in certain situations where the death penalty is sought." *People v. McCoy*, 337 Ill. App. 3d 518, 523 (2003). Defendant has not argued that an exception applied; thus, we find the fact that defendant was convicted under an accountability theory does not render his sentence excessive. See *id.*

¶ 90    We are similarly unpersuaded by defendant's claim that his sentence is excessive since codefendant Gill, the principal shooter, was sentenced to only 29 years. An arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible. *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). A disparity in sentences, however, does not by itself establish that a defendant's sentence is unfair. *People v. Kline*, 92 Ill. 2d 490, 508 (1982). A disparity may be justified by factors including the defendant and codefendant's relevant character and history, degree of culpability, criminal records, or rehabilitative potential. *People v. Rodriguez*, 402 Ill. App. 3d 932, 940 (2010).

¶ 91    During the sentencing hearing, the trial court found that the disparity between defendant's and his brother's sentences was justified, pointing to defendant's criminal history, evidence that defendant was found with shanks while in custody, and defendant's lack of remorse, in contrast with Gill's lack of criminal background and showing of remorse and the fact that Gill's sentence came as the result of a guilty plea. The record demonstrates that the trial

court accounted for defendant's and codefendant Gill's relevant character and history, criminal records, and rehabilitative potential. See *id.* Thus, we find that the disparity between defendant and his brother's sentences was not arbitrary and unreasonable. See *Caballero*, 179 Ill. 2d at 216.

¶ 92    Finally, defendant contends that the trial court failed to account for his rehabilitative potential. Specifically, defendant contends that the trial court did not account for his age at the time of the offense, mental health condition, substance abuse and addiction, education, and family support.

¶ 93    All sentences must reflect the seriousness of the offense committed and the objective of rehabilitating offenders to useful citizenship. *People v. Williams*, 2017 IL App (1st) 150795, ¶ 44. The trial court must consider all factors in mitigation and aggravation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Furthermore, when considering a defendant's sentence, we presume the trial court considered all the factors in mitigation, and that presumption cannot be overcome without evidence from the record demonstrating that the trial court did not consider mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). We will defer to the trial court's judgment since, "having observed the defendant and the proceedings," the trial court "had the opportunity to weigh defendant's demeanor, credibility, general moral character, mentality, habits, social environment, and age." *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 81.

¶ 94    Defendant fails to point to any evidence that the trial court did not account for the fact that defendant was 23 at the time of the offense or that the trial court did not account for defendant's mental health condition, substance abuse and addiction, education, and family support. The trial court stated that it had read defendant's PSI, which indicated that defendant was 23 at the time of the offense. In addition, as to defendant's mental illness, the PSI indicated

that defendant was diagnosed with ADHD at a young age, that he met with a mental health professional throughout his childhood, and that he reported having suicidal thoughts before and after his conviction. Further, when considering the factors in mitigation, the trial court expressly noted that the PSI indicated that defendant was diagnosed with ADHD but that it could not find that this constituted a "serious mental illness" for purposes of mitigation. See 730 ILCS 5/5-5-3.1(a)(16) (West 2018) (setting forth, as a mitigating factor, that "[a]t the time of the offense, the defendant was suffering from a serious mental illness which, though insufficient to establish the defense of insanity, substantially affected his or her ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law"). As to defendant's substance abuse and addiction, the PSI stated that he began smoking marijuana daily when he was 12 years old and began drinking alcohol on the weekends when he was 13 years old. Finally, as to defendant's education and family support, the PSI indicated that defendant graduated high school and was supported by his family and girlfriend.

¶ 95    We therefore find that defendant's sentence was not excessive and that the trial court did not abuse its discretion when sentencing defendant. See *Jackson*, 375 Ill. App. 3d at 800.

¶ 96                        V. The Constitutionality of Defendant's Arrest

¶ 97    Having addressed defendant's nonconstitutional arguments, we now address his constitutional argument. See *Hampton*, 225 Ill. 2d at 244 ("Constitutional issues should be addressed only if necessary to decide a case."). Defendant first argues that the trial court erred when it denied his motion to quash arrest and suppress evidence, contending that his motion set forth a valid claim that his arrest was unconstitutional. Defendant argues that his arrest violated article I, section 6, of the Illinois Constitution since police arrested him pursuant to an investigative alert and failed to obtain a warrant or support their probable cause assessment with

an affidavit presented to a neutral magistrate. Defendant further argues that his warrantless arrest was unconstitutional since there were no exigent circumstances. As a remedy, defendant asks that we suppress the fruit of defendant's seizure and remand for a new trial without that evidence.

¶ 98    Our review of the trial court's ruling on defendant's motion to quash arrest and suppress evidence presents questions of both fact and law. *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006). We will not disturb a trial court's findings of fact unless they are against the manifest weight of the evidence. *People v. Burns*, 2016 IL 118973, ¶ 15. The court's ultimate ruling on the motion is a question of law, and we review it *de novo*. *Id.* ¶ 16.

¶ 99    As noted, defendant first contends that his arrest was unconstitutional, since the police arrested him pursuant to an investigative alert. The United States and Illinois constitutions protect citizens from police officers' unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I., § 6; *People v. Holmes*, 2017 IL 120407, ¶ 25. The fourth amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Similarly, article 1, section 6, of the Illinois Constitution guarantees that "[t]he people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures" and that "[n]o warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I., § 6.

¶ 100   As recently as 2014, the question of whether arresting a defendant based on an

investigative alert violates the Illinois Constitution had not been addressed in any detail by our courts.[6] See *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 39 (Salone, J., specially concurring). However, beginning in 2019, a number of First District cases have considered the issue, reaching differing results. The majority of the cases to consider the issue have concluded that investigative alerts pose no constitutional problems, as warrantless arrests are permitted under the constitution so long as they are supported by probable cause, and prohibiting such an arrest merely due to the fact that an investigative alert was issued would create a paradoxical result. See, *e.g.*, *People v. Braswell*, 2019 IL App (1st) 172810, ¶¶ 37, 39; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 48-50; *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 64; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 63-64; *People v. Dossie*, 2021 IL App (1st) 201050-U, ¶ 21, *appeal dismissed per curiam*, 2023 IL 127412, ¶ 1.

¶ 101    Two cases, however, both decided by divided panels, have concluded that the Illinois Constitution is broader than the federal Constitution on this issue and that the Illinois Constitution did not permit warrantless arrests pursuant to an investigative alert, even those supported by probable cause. See *People v. Bass*, 2019 IL App (1st) 160640, ¶ 71, *aff'd in part, vacated in part*, 2021 IL 125434; *People v. Smith*, 2022 IL App (1st) 190691, ¶ 99.

¶ 102    The Illinois Supreme Court has not yet addressed the issue, although petitions for leave to appeal two of the above cases have been allowed by the court. In *Bass*, the supreme court ultimately affirmed the appellate court opinion in *Bass* on different grounds and vacated its discussion of investigative alerts. *People v. Bass*, 2021 IL 125434, ¶ 33, *aff'g in part and vacating in part* 2019 IL App (1st) 160640. In *Dossie*, while the defendant's petition for leave to

---

[6] We note that, in *People v. Bass*, 2019 IL App (1st) 160640, ¶ 5, *aff'd in part, vacated in part*, 2021 IL 125434, the court observed that, within Illinois, the Chicago Police Department appears to be the only law enforcement agency using investigative alerts.

appeal was granted by the supreme court, the appeal was ultimately dismissed when the supreme court could not secure the constitutionally-required concurrence of four justices. *People v. Dossie*, 2023 IL 127412, ¶ 1, *dismissing per curiam appeal from* 2021 IL App (1st) 201050-U. Additionally, we note that our supreme court recently allowed a petition for leave to appeal from *People v. Clark*, 2021 IL App (1st) 180523-U, in which the appellate court found that the defendant's arrest pursuant to an investigative alert was constitutional. See *People v. Clark*, 2021 IL App (1st) 180523-U, *appeal allowed*, No. 127838 (Ill. Mar. 29, 2023).

¶ 103   After reviewing the cases discussing the issue as set forth above, we agree with the State that the line of cases holding that investigative alerts are constitutional represents the better-reasoned approach. As noted, the court in *Smith* found that the Illinois Constitution went further than the fourth amendment and required that police not rely solely on an investigative alert prior to an arrest, even if the investigative alert is supported by probable cause. *Smith*, 2022 IL App (1st) 190691, ¶ 99. If an officer already has probable cause to arrest someone, however, we fail to see how doing so pursuant to an investigative alert renders the arrest unconstitutional. Both the *Braswell* court and the partial dissent in *Bass* recognized this inconsistency. See *Braswell*, 2019 IL App (1st) 172810, ¶ 39; *Bass*, 2019 IL App (1st) 160640, ¶ 120 (Mason, J., concurring in part and dissenting in part). Accordingly, we view the rule announced in *Smith* as not merely limiting Illinois law allowing warrantless arrests supported by probable cause but as contradicting that law outright. See, *e.g.*, 725 ILCS 5/107-2(1)(c) (West 2014) ("A peace officer may arrest a person when *** [h]e has reasonable grounds to believe that the person is committing or has committed an offense.").

¶ 104   For these reasons, we decline to follow *Smith* and instead follow *Braswell*, *Simmons*, *Thornton*, and *Bahena*. Since defendant does not dispute that the police had probable cause to

arrest him, we find the fact that they arrested defendant pursuant to an investigative alert did not, by itself, render the arrest unconstitutional. See *Braswell*, 2019 IL App (1st) 172810, ¶ 39; *Simmons*, 2020 IL App (1st) 170650, ¶ 64; *Thornton*, 2020 IL App (1st) 170753, ¶¶ 48-50; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 63-64; see also *Bass*, 2019 IL App (1st) 160640, ¶ 120 (Mason, J., concurring in part and dissenting in part).

¶ 105    Defendant also argues that his warrantless arrest violated the Illinois Constitution since the police did not arrest him under exigent circumstances. Illinois law, however, does not require exigent circumstances to make a warrantless arrest. See 725 ILCS 5/107-2(1)(c) (West 2014) ("A peace officer may arrest a person when *** [the peace officer] has reasonable grounds to believe that the person is committing or has committed an offense."). Defendant, moreover, does not cite Illinois law supporting this contention; defendant cites only the United States Supreme Court's decisions *Terry v. Ohio*, 392 U.S. 1, 20 (1968), and *Kentucky v. King*, 563 U.S. 452, 459-60 (2011). Neither of these cases supports defendant's contention. Rather, the United States Supreme Court has long found that the fourth amendment does not require exigent circumstances to make a warrantless arrest. See *U.S. v. Watson*, 423 U.S. 411, 423 (1976) ("Congress has plainly decided against conditioning warrantless arrest power on proof of exigent circumstances. *** [J]udgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate. But we decline to transform this judicial preference into a constitutional rule ***.").

¶ 106    Thus, we find that defendant's warrantless arrest pursuant to an investigative alert did not violate the Illinois Constitution, and we find that the trial court did not err when it denied defendant's amended motion to quash arrest and suppress evidence.

¶ 107                              CONCLUSION

¶ 108   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 109   Affirmed.