2024 IL App (1st) 221261-U

No. 1-22-1261

Order filed July 24, 2024

THIRD DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 08 CR 03237 |
| v. | ) ) | Honorable Michael R. Clancy |
| BRYANT BUCKHANAN, | ) ) | Judge, Presiding |
| Defendant-Appellant. | ) ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Justices Lampkin and Van Tine concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant's arrest was constitutional, and his second trial counsel was not constitutionally ineffective. Defendant's arguments regarding the second trial court's jury admonishments and cumulative error are forfeited. Affirmed.

¶ 2     In the early morning hours of August 19, 2007, Omari Houston (Omari) was shot to death near the intersection of W. Lake Street and N. Halsted Street. Defendant Bryant Buckhanan was charged with first-degree murder. A jury found defendant guilty of first-degree murder

and found that defendant had personally discharged a firearm proximately causing death. On appeal, this court reversed and remanded to the trial court, finding that the trial court had erred in denying defendant his counsel of choice. After a second jury trial, defendant was again found guilty and sentenced to 60 years' incarceration. In this direct appeal from his second trial, defendant argues (1) that the trial court failed to follow the requirements of Rule 431(b) (Ill. Sup. Ct. R. 431(b) (eff. July 1, 2012)) when questioning jurors, (2) that trial counsel was ineffective for failing to impeach a witness with a prior inconsistent statement, (3) that cumulative error denied defendant a fair trial, and (4) that defendant's arrest was unconstitutional because he was arrested pursuant to an investigative alert.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. Jury Admonishments

¶ 5        The trial court instructed selected jurors on the relevant law as follows:

        "Now, under the law, a Defendant is presumed to be innocent of the charges against him.

        This presumption remains with him throughout every stage of the Trial and during your deliberations on a verdict; and it is not overcome, unless, from all the evidence in the case, you are convinced beyond a reasonable doubt, that the Defendant is guilty.

        The State has the burden of proving the guilt of the Defendant, beyond a reasonable doubt; and this burden remains upon the State throughout the case.

        The Defendant is not required to prove his innocence, nor is he required to present any evidence on his own behalf. He may rely on the presumption of innocence."

¶ 6        Later, after a recess, the trial court continued to instruct the jury:

"Now, the Defendant is presumed to be innocent of the charges against him. This presumption remains with the Defendant throughout the Trial, and is not overcome unless by your verdict, you find the State has proven the Defendant guilty beyond a reasonable doubt.

Does anybody have a quarrel with this proposition of law?

If so, raise your hand.

The record will reflect there are none.

The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt.

This burden remains upon the State throughout the Trial.

Anybody have a quarrel with this proposition of law, the burden of proof?

If so, raise your hand.

Record will reflect there are none.

The Defendant is not required to prove his innocence.

Anybody have a quarrel with this proposition of law?

If so, raise your hand.

Record will reflect there are none.

The Defendant has the absolute right to remain silent. He may elect to sit there, not testify in his own defense, and rely on the presumption of innocence.

You may draw no inference from the fact the Defendant chooses to remain silent, either in favor of or against the Defendant, because he elects to remain silent.

3

Anybody have a quarrel with this proposition of law, the right of the Defendant to remain silent?

If so, raise your hand.

Okay. Record will reflect there are none."

¶ 7                                              B. Shooting and Investigation

¶ 8        Four eyewitnesses testified at trial with matching accounts of the events leading up to the offense in this case, though in some cases specific details were mentioned by at least one, but not all four eyewitnesses. The eyewitnesses were Kenyatta Houston (Kenyatta), wife of Jabari Houston and thereby the sister-in-law of the victim, Omari Houston, Tangela Smith (Smith), Carissa Marzette (Marzette), and Malika McCollum (McCollum).

¶ 9        The eyewitnesses all testified that on the night of August 18, 2007 and leading into the early morning hours of August 19, 2007, they attended a "white party," where those who attend are supposed to wear white. The party was at a nightclub called Chromium near the intersection of W. Lake Street and N. Halsted Street. After the club closed, sometime between 2:00 and 3:00 a.m., the four began to head home. Marzette departed with McCollum riding in her car. Before Kenyatta could depart with Smith riding in her car, she received a phone call from Omari, who had been at the neighboring Shadow Bar. Omari inquired as to whether Marzette was with Kenyatta's group and asked Kenyatta to call and ask Marzette to return so that Omari could speak with her. Kenyatta testified that Omari was romantically interested in Marzette and that she placed the requested call to Marzette. Marzette returned and parked her car in front of Kenyatta's along the south side of Lake Street. Smith stood by the passenger seat of Kenyatta's car and spoke with a friend of Omari's named Theos.

Marzette, McCollum and Omari gathered beside Kenyatta's car while Kenyatta sat in the driver's seat and the four of them talked.

¶ 10    While the six were talking, a silver vehicle that some of the eyewitnesses identified as an Infiniti pulled up to a stop next to Kenyatta's car. Omari exchanged some words with the occupants of the Infiniti. Kenyatta testified that although she did not hear all that was said, Omari seemed upset, tapped the back of the Infiniti, and told its occupants: "This is family, you all can keep it moving." Three of the four eyewitnesses saw the driver reach over and open the glovebox of the Infiniti and saw a gun inside, which two of the three described specifically as silver. McCollum testified that the passenger made a "no" motion with his hand and the driver shut the glovebox. Marzette testified that she approached the car with Omari, attempting to pull him away and prevent conflict. Marzette saw the driver open his door, as if to get out, but then close the door. The Infiniti then drove away down Lake and turned onto Halsted. All four eyewitnesses identified defendant in court as the passenger in the Infiniti.

¶ 11    After the Infiniti drove away, Marzette, McCollum, and Omari went to Marzette's car and got in. Marzette testified that she had begun to inquire of Omari what words had been exchanged when defendant approached her car from the direction of Halsted. Defendant walked between Marzette's car and Kenyatta's car, at which time Omari got out of Marzette's car. Marzette again tried to pull Omari away but was unsuccessful. Defendant pushed Omari, Omari pushed defendant back. Marzette abandoned her efforts and returned to her car. After the small tussle between Omari and defendant, defendant "end[ed] up on the side of the sidewalk" near where Smith was standing. Smith testified that she attempted to "calm him down, diffuse [sic] the situation." During Smith's conversation with defendant,

defendant opened his coat and displayed a gun to Smith. McCollum testified to seeing defendant display a silver gun as well. Marzette did not see this display but did testify to seeing something shiny at defendant's waist shortly afterward. Smith testified: "The way he swung his coat back he was letting me know that I blaze dude. That's what he was saying, he was telling me that, I blaze dude." It is not clear whether these words were actually spoken or whether this was just the message that Smith understood the display to convey.

¶ 12    Upon seeing the gun, McCollum called out that defendant had a gun and that it was time to go. While Smith and defendant talked, Marzette convinced Omari to get back into the back seat of her car. McCollum returned to the passenger seat of Marzette's car, and the three departed eastward across Halsted Street. Immediately after Marzette's car crossed Halsted, Omari asked her to stop, as his car was parked there. Around this same time, the Infiniti pulled up at the corner where Smith was talking with defendant. The driver opened the passenger side door and yelled at defendant to get in. Defendant complied. Smith described defendant as seeming hesitant as he backed to the vehicle, as if he did not want to get in. The Infiniti then reversed or made a U-turn and proceeded east onto Lake Street, where it pulled up next to Marzette's car.

¶ 13    Each eyewitness described the shooting with different details that are relevant to defendant's arguments on appeal. Smith testified that she was rushing back to Kenyatta's car when she heard gunshots. When she looked to the east, she saw the Infiniti driving away from Marzette's car. Kenyatta testified that the Infiniti stopped parallel to Marzette's car, and a hand holding a gun emerged from the passenger side window of the Infiniti. Kenyatta heard and saw gunshots before the Infiniti drove away. Both Smith and Kenyatta noted the license plate of the Infiniti as it drove toward Marzette's car just before the gunshots: LISLE79.

¶ 14    Marzette testified that she was telling Omari to get his things and get out of her car when she heard a car speed up the street and come to a stop next to hers, followed by the sounds of gunshots and shattering glass. Marzette felt "heat around [her] head" and ducked down to avoid the gunfire. She then heard the car speed away and, upon looking, saw that it was the same Infiniti she had seen moments earlier. Marzette heard Omari say "oh, shit" and heard a rear door open and close. Marzette was "terrified" and drove away with McCollum in the car before eventually returning to the scene.

¶ 15    McCollum testified that she was sitting in the passenger seat of Marzette's car, turned to the left and looking back toward Omari in the rear when she saw the Infiniti perform a U-turn and drive up "so fast [she] was in shock" before stopping next to the left of Marzette's car, where McCollum was looking. McCollum saw defendant "lean out the car with the gun," point it at the back seat, and open fire. She ducked after the first shot. By the time McCollum sat up again, the Infiniti was gone. Omari held his side, said "oh, shit," and opened the door and got out. McCollum screamed at Marzette to take her home, and Marzette drove away with McCollum. The two "didn't get that far" before Marzette insisted on returning to the scene. On cross-examination, the following colloquy occurred between McCollum and defense counsel:

> "COUNSEL: When you gave this interview to Detective Moreth on August 19th, 2007, in the afternoon, you didn't tell the detective at that time that you saw the shooter in this case, correct?"
>
> MCCOLLUM: When?
>
> COUNSEL: August 19th, 2007, in the afternoon when you're at the station.

7

MCCOLLUM: I saw the shooter, so I'm pretty sure I told them I saw the shooter, and I identified him twice.

COUNSEL: Well, you didn't identify him twice on August 19th?

MCCOLLUM: No, just overall."

Defense counsel then proceeded to inquire as to the frequency and degree of contact between McCollum and the other eyewitnesses between the time of her initial discussion with police and her subsequent identifications of defendant as the shooter.

¶ 16    On redirect examination, the State questioned McCollum as follows:

"STATE: And during cross examination, counsel asked you the question that you never said that you never [sic] saw the face of the shooter, right?

MCCOLLUM: Yes.

STATE: But in fact, you told Detective Moreth that the individual who displayed the silver handgun during the argument with the victim Omari Houston, later fired that silver pistol from the front seat of a silver Infiniti in the direction of Carissa Marzette's car, striking Omari Houston and fatally wounding him; isn't that what you told him?

MCCOLLUM: Yes."

¶ 17    Police who heard the gunshots, but saw nothing of the incident, arrived on the scene within moments. Omari was found unresponsive and later died.

¶ 18    All four eyewitnesses spoke with the police and went to the Area 4 police station that same day of August 19, 2007 to view photo arrays. Smith, Marzette, and McCollum identified defendant in the photo arrays as the passenger who was in the Infiniti. Kenyatta testified that she could not make an identification because the photos were dark and of poor

quality. All four eyewitnesses later received a call from the police and went back to the police station on January 9, 2008 to view a lineup. All four identified defendant in the lineup as the passenger who was in the Infiniti.

¶ 19    Smith and Marzette again returned to the police station to view another photo array in August 2008. Both identified an individual in that photo array as the driver of the Infiniti. All four eyewitnesses were also asked to go to the Cook County Jail to view a physical lineup in August 2008. Kenyatta was unable to view the lineup, as she forgot her identification card that day and was unable to enter the jail. The other three eyewitnesses identified an individual in the second lineup as the driver of the Infiniti.

¶ 20    Illinois State Police Trooper Robert Neuman testified that on the morning of August 19, 2007, he was on patrol on Interstate 88. At about 5:00 a.m., he received a dispatch call about a car crashed in a ditch on I-88. Upon arrival, he discovered a gray Infiniti abandoned about 20 feet off the roadway in a ditch with the keys in the ignition. The Infiniti's license plate was LISLE79.

¶ 21    Andrew Panegasser, an employee in the service department of the car dealership operated under the name Infiniti of Lisle, testified that defendant brought in his car for repairs on August 13, 2007 and was issued a loaner car. Defendant returned the first loaner car on August 18, 2007, complaining of noisy brakes and asking for a new loaner because he was going out to a "white party" that night. Defendant was issued a second loaner car: an Infiniti with the license plate LISLE79. Panegasser made multiple attempts to contact defendant after August 18 regarding his car, and the dealership was eventually contacted by the Chicago Police Department on August 28, 2007.

¶ 22 Various police witnesses testified, in court or by stipulation, that the Infiniti discovered on I-88 contained a loaner car agreement with defendant's name and driver's license number on it. The Infiniti also contained a tube of lip balm that returned positive results for defendant's DNA. Some compact disks in the car returned three identifiable fingerprints, two of which matched defendant and one of which matched Brian Miller, who was the man identified as the driver in photo arrays and the lineup in August 2008.

¶ 23 It is undisputed that defendant was subsequently arrested pursuant to an investigative alert and without a warrant for his arrest.

¶ 24 II. ANALYSIS

¶ 25 On appeal, defendant argues (1) that the trial court failed to properly admonish the jury regarding relevant principles of law under Illinois Supreme Court Rule 431, (2) that his second trial counsel was ineffective for failing to impeach McCollum with a prior inconsistent statement, (3) that defendant was prejudiced by a number of small errors amounting to cumulative error, and (4) that defendant's arrest pursuant to an investigative alert was unconstitutional.

¶ 26 A. Rule 431 Error and Cumulative Error

¶ 27 Defendant argues that the circuit court failed to comply with Illinois Supreme Court Rule Rule 431(b) (eff. July 1, 2012)) during *voir dire*, when instructing jurors on the four basic tenets of law for which admonishments are required under the rule.

¶ 28 Rule 431(b) states:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be

10

convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." *Id.*

¶ 29    Defendant acknowledges that he made no objection alleging a Rule 431 violation at trial and asks that, for lack of proper preservation, we review the error as plain error. "To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion." *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). However, a "narrow and limited exception" exists where an appellant can demonstrate plain error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step of establishing plain error is to "show that a clear or obvious error occurred." *Id*.

¶ 30    Here, plain error exists where the trial court minimally failed to comply with the requirements of Rule 431(b). A recess was had just before the trial court began its Rule 431 admonishments. Just prior to that recess, the trial court instructed the jury on, among other things, the fact that the defendant need not present any evidence in his own defense. At this time, the trial court did not inquire of the jurors whether they understood and accepted that proposition of law. After the recess, when the trial court did begin to list the Rule 431(b) propositions and ask the jurors whether they understood and accepted those tenets of law, the trial court failed to mention that the defendant is not required to offer any evidence on his behalf. The trial court did state that the defendant could sit silent, not testify on his own behalf, and rely on the presumption of innocence without the need to prove that innocence. None of these statements are equivalent to a statement that the defendant is not required to

offer evidence on his behalf. Although the trial court did state that proposition of law, a question-and-answer process is necessary to Rule 431 admonishments and no such process was conducted with regard to this point of law. *People v. Wilmington*, 2013 IL 112938, ¶ 32 (stating that, even if not in precise terms, jurors *must* be asked whether they understand and accept each enumerated principle).

¶ 31    The second prong of the plain error doctrine allows for review of unpreserved errors in two scenarios:

> "[W]hen (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 32    Defendant argues that the evidence is close in the case at hand and therefore it satisfies the first of these two options. To meet his burden, defendant must "show that the error was prejudicial—in other words, he must show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *Id.* at 566 (citing *People v. Herron*, 215 Ill. 2d 167, 193 (2005)). "[A] reviewing court must undertake a commonsense analysis of all the evidence in context when reviewing a claim under the first prong of the plain error doctrine." *Belknap*, 2014 IL 117094, ¶ 50. "Where a case does not involve competing witnesses and the jurors are not asked to determine 'relative credibility,' the factfinder's responsibility to assess witness credibility does not automatically make the

evidence closely balanced." *People v. Scott*, 2020 IL App (1st) 180200, ¶ 51 (citing *People v. Hammonds*, 409 Ill. App. 3d 838, 861-62 (2011)).

¶ 33        Defendant argues that the driver could have been the one to shoot from the passenger side window, that the driver showed hostility first by opening the glove compartment containing the gun, and that the driver yelling to defendant to return to the car demonstrated that he was enraged seconds before the shooting. By comparison, the eyewitness testimony, if believed, established that defendant approached Omari on foot shortly before the shooting and displayed a gun, possibly the same gun that was seen in the glove compartment shortly before, and threatened (whether implicitly or explicitly) to shoot Omari. Defendant was reluctant to return to the car, which could be interpreted as a continued interest in threatening or fighting with Omari. Lastly, every eyewitness who saw the gunshots stated that they came from the passenger side where defendant was, by all accounts, sitting, and the one witness directly at the scene of the shooting who was looking in the direction of the shooter at the time of the shooting identified defendant as the shooter. No testimony was elicited that the driver was identified as the shooter by any witness or any other evidence. We cannot say that the evidence was close in this case. Accordingly, defendant's argument regarding Rule 431(b) admonishments does not qualify for plain error review and is forfeited.

¶ 34        Defendant also argues that, due to a number of alleged errors on the part of the trial court, this court should find cumulative error. Defendant admits that none of the alleged errors supporting the claim of cumulative error were preserved but asks that they be examined under plain-error analysis. As defendant presents these errors as problematic only in conjunction, defendant's argument for plain error review must necessarily rely on a finding that the evidence was closely balanced in this case. As we have found above, it was not.

Accordingly, we need not further examine defendant's claim of cumulative error, as it, too, is forfeited.

¶ 35                                 B. Ineffective Assistance of Counsel

¶ 36        Defendant argues that his trial counsel was ineffective because trial counsel failed to impeach McCollum with a prior inconsistent statement to police. However, the record does not support defendant's contention and so we cannot agree.

¶ 37        Illinois adheres to the same two-prong test for ineffective assistance of counsel laid out in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984)). Under *Strickland*, a defendant must prove that (1) trial counsel's representation fell below an objective standard of reasonableness and that (2) absent these errors, there was a reasonable possibility that the result of the trial would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36. In order to prevail, defendant's claim must satisfy both prongs. *Colon*, 225 Ill. 2d at 135.

¶ 38        To the degree that defendant's claim is based on any official report or record of McCollum's statements to police, both parties agree that such a report is not in the record. Defendant bases his claim solely on one of trial counsel's oral post-trial motions, in which trial counsel asserted that "it's all in the supplemental reports and other reports, that she heard the gunshots" as opposed to seeing at least one gunshot fired. Defendant seems content to trust trial counsel's assertion and insists that the claim is valid because "[a] record need not include every document from the trial court" and "the record is adequate where 'issues can be resolved on the record as it stands.' " The quote used by defendant is from *Marx Transport, Inc. v. Air Express International Corp.*, 379 Ill. App. 3d 849, 853 (2008). In that case, a record of proceedings was not filed, but the court was able to reach the merits of the

case via the common law record, which contained the parties' stipulations at trial and the trial court's articulated basis for its decision. *Id*. The scenario presented in *Marx Transport* is not equivalent to the case at bar, in which defendant's appellate counsel is asking this court to find that defendant was deprived of his constitutional right to effective counsel based on a document orally mentioned by trial counsel in court, but that is not before us for our review. Defendant's appellate counsel stretches the argument for ineffective assistance of counsel beyond reason by effectively asking this court to hinge a finding that a constitutional right was violated on what is equivalent to hearsay—a request that we trust that the document was significantly impeaching because of nothing more than the fact that appellate defense counsel believes that trial counsel was onto something. This argument has no legal basis whatsoever.

¶ 39      That aside, as the State points out, an effort was made to impeach McCollum. Defendant's first trial counsel attempted to impeach McCollum with her prior statements by pointing out that she only mentioned hearing gunshots when interviewed by police, not seeing gunshots. The first trial court stated that it did not find that difference to be impeaching. First trial counsel subsequently proposed a stipulation that McCollum never told the detective interviewing her that she had seen gunshots fired that night, and the trial court sustained its previous ruling on the matter and rejected the stipulation. Defendant appealed, but this court's decision did not address the trial court's decision on that matter and remanded on other grounds.

¶ 40      Defendant's second trial counsel also sought to impeach McCollum but focused on whether she saw the shooter's face rather than whether she saw the gun fired. The choice to pursue the question of why McCollum did not tell police that she had seen the shooter's face rather than the question of why McCollum only mentioned hearing the shots, rather than

seeing them, is one that can readily be explained by trial strategy. The court, albeit with a different judge presiding, had rejected the first trial counsel's approach and the jury had found defendant guilty, so we cannot say that the decision to take a different approach to impeachment during the second trial is one that falls below an objective standard of reasonableness. *Domagala*, 2013 IL 113688, ¶ 36. As such, even if we were to take defendant's assertions on appeal as true, his ineffective assistance of counsel claim fails.

¶ 41                                C. Constitutionality of Arrest

¶ 42       Lastly, Defendant asserts that his warrantless arrest was unconstitutional because the probable cause justifying the arrest was derived from an investigative alert rather than from an officer witnessing actions or events sufficient to constitute probable cause.

¶ 43       There is no dispute regarding the facts surrounding defendant's arrest, so all that remains for our review is a question of law. The matter of the constitutionality of warrantless arrests made pursuant to probable cause provided by investigative alerts has been addressed recently and at length in this court's decision in *People v. Gill*, 2023 IL App (1st) 201109-U. As detailed therein, the appellate jurisprudence on this matter is split. *Id*. ¶100-01. As yet, our supreme court has provided no clarity on this matter, but, as defendant points out, this matter is currently before our supreme court in *People v. Clark*, 201 N.E.3d 770 (2023) (granting leave to appeal). We see no need to recite what has already been well laid out in *Gill* and, again, follow *People v. Braswell*, 2019 IL App (1st) 172810, in finding that defendant's arrest was constitutional.

¶ 44                                III. CONCLUSION

¶ 45  For the foregoing reasons, we affirm the second trial court's order and defendant's conviction.

¶ 46  Affirmed.